**THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

KNORR-BREMSE SYSTEME FUER     )
NUTZFAHRZEUGE GMBH,         )
        Plaintiff,               )
                              )
     v.                        )     Civil Action No.  1:00cv803
                              )
DANA CORPORATION, et al.,       )
        Defendants.          )

## <u>MEMORANDUM OPINION</u>

In this remanded patent infringement action, the plaintiff sued three of its competitors in the worldwide brake industry for literal and willful infringement of U.S. Patent No. 5,927,445 (the '445 patent), which claims an invention in the field of air disk brakes used in large commercial road vehicles. Following a *Markman*[1] claim construction hearing and various summary judgment rulings, a bench trial was held on the remaining infringement and validity issues, resulting in findings of literal and willful infringement, an award of partial attorney's fees to plaintiff pursuant to 35 U.S.C. § 285, and the entry of a Final Judgment and Injunction.  On defendants' direct appeal challenging only the findings of willful infringement and the award of attorney's fees to plaintiff, an *en banc* panel of the Court of Appeals for the Federal Circuit overruled a long-standing principle of willful infringement law, thus necessitating the instant remand for a re-determination on the issues of willful infringement and the award of attorney's fees under the "exceptional case" standard set forth in 35 U.S.C. § 285.  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.*, 383 F.3d 1337, 1340 (Fed. Cir. 2004).

---

[1] *Markman v. Westview Instruments*, 517 U.S. 370 (1996) ((holding that the resolution of disputed patent claim terms is a question of law for the district court to resolve).

**I.**[2]

A brief summary of the facts is necessary to put the remanded issues of willful infringement and attorney's fees in context. Specifically, the record reflects that plaintiff, Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH (Knorr), a German brake manufacturer, is the owner by assignment of the patent in issue, namely U.S. Patent No. 5,927,445 (the '445 patent). All three defendants are major competitors of Knorr in the worldwide brake industry. Defendant Haldex Brake Products AB (Haldex AB) is a Swedish manufacturer of various components of heavy vehicle braking systems, while defendant Haldex Brake Products Corporation (Haldex Corp.) is the American affiliate of Haldex AB.[3]

The record reflects that Haldex began developing a product to compete in the emerging air disk brake market in approximately 1994, long before the instant litigation. A prototype of this first design was completed sometime late that year. This original air disk brake product was referred to by Haldex internally as the Mark I device. The following year, in 1995, Haldex began development of an alternative air disk brake design — the so-called Mark II device — which later precipitated the filing of this action. The first prototype of the Mark II air disk brake was developed by Haldex sometime in 1996.

In the late 1990's, Haldex teamed with defendant Dana Corporation, an American retailer of commercial vehicle products, to manufacture and offer for sale an air disk brake product in the

---

[2]   The facts recited here are derived from (i) the testimony and evidence presented in the course of the four-day bench trial, held on January 8-11, 2001, (ii) the Findings of Fact and Conclusions of Law set forth in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.*, 133 F. Supp. 2d 843 (E.D. Va. 2001) and (iii) the record as a whole.

[3]   Unless otherwise noted, Haldex AB and Haldex Corp. are collectively referred to herein as "Haldex."

United States.  In furtherance of this joint venture, from late 1997 to 1999, Haldex shipped to Dana, free of charge, between 100 and 200 Mark II air disk brakes to allow Dana the opportunity to undertake extensive testing of the Mark II device in U.S. laboratories and on U.S. test tracks and roadways.  In this regard, to gain "real-world experience" during the testing period, Dana installed some of these Mark II devices on its in-house truck fleet, while others were installed on several of Dana's customers' vehicles at no charge to the customers.  In all, Dana equipped approximately eighteen vehicles with Haldex-manufactured Mark II air disk brakes in the course of the joint venture.

On July 27, 1999, while Dana and Haldex were collaborating with respect to the Mark II device, the '445 patent was issued by the Patent and Trademark Office (PTO).  This patent was acquired by Knorr via an assignment and claims an invention in the field of air disk brakes.  The '445 patent consists of a total of 11 claims, nine of which were at issue in this litigation, namely claims 1-5 and 8-11.  Claim 1, in particular, begins with a preamble general description of the claimed invention as being a

> [d]isk brake for, road vehicles, having a caliper which comprises a brake disk and on one side of which a brake application unit is arranged which has a rotary lever swivellable by an operating cylinder, the rotary lever being capable of acting by means of an eccentric onto a bridge which can be displaced against a spring force in the direction of the brake disk and has at least one adjusting spindle provided with a pressure piece... .

Claim 1 of the '445 patent then adds the following elements to the claimed art air disk brake:

> a) the caliper is constructed in one piece such that the section of the caliper receiving the application unit is largely closed in a rearward area facing away from the brake disk, with the exception of an opening for the access of the operating cylinder, and

b) the application unit is insertable as a preassembled unit into the caliper through the opening facing the brake disk when the caliper is removed from the brake disk.

Claims 2, 3, 4, 5 and 8 are all dependent claims that add certain elements to the claimed invention.  For example, claim 2 adds an element to claim 1, from which it depends, in that "the opening of the caliper facing the brake disk, when the application unit is inserted, is closed off by a closing plate which is penetrated by at least one pressure piece."  Claim 4 also depends from claim 1 and additionally requires that the brake application unit be "joined together as a preassembled unit by means of a bow element."  Claims 3 and 5, which depend from claims 2 and 4, respectively, add the identical element that "the pressure pieces are in each case sealed off by means of bellows with respect to the closing plate penetrated by them."  Claim 8, which depends from claim 1, then further requires that the closing plate be screwed to the caliper by means of studs.

Claim 9 of the '445 patent is an independent claim pertaining to assembly, requiring (i) a brake disk, (ii) a caliper and (iii) a brake application unit that includes a rotary lever, an eccentric, a displaceable bridge, at least one adjusting spindle and at least one pressure piece.  Like claim 1, claim 9 requires that the caliper be formed in one piece, with the section of the caliper receiving the brake application unit being substantially closed in an end area.  Claim 9 also requires that the brake application unit be capable of being inserted as a preassembled unit into the caliper through an opening facing the brake disk.  Claim 10, which depends from claim 9, then requires that the caliper opening be closed off by a closing plate that is penetrated by at least one pressure piece.

Finally, claim 11, an independent method claim, recites the following three-step method for making the claimed invention:  (i) forming a one-piece caliper that is largely closed in a rearward area facing away from the brake disk, (ii) preassembling a brake application unit that includes a

4

rotary lever capable of acting by an eccentric to push selectively at least one brake shoe against the brake disk, and (iii) inserting the preassembled brake application unit into the caliper through an opening facing the brake disk, and then closing this opening with a cover plate that is penetrated by a pressure piece capable of acting against at least one brake shoe.

Shortly after issuance of the '445 patent, Knorr filed a patent infringement action against Haldex in the District of Duesseldorf, Germany, alleging that the Mark II air disk brake infringed the German counterpart to the '445 patent, namely German patent DE 195 15 063. Knorr and Haldex subsequently held a meeting sometime in August 1999 regarding resolution of the German patent litigation. In the course of this meeting, Knorr advised Haldex that the '445 patent had recently been issued in the United States. Haldex thus obtained a copy of the '445 patent at, or shortly after, this August 1999 meeting with Knorr concerning the German litigation.

After learning of the '445 patent, Haldex contacted European counsel regarding infringement and validity issues. Additionally, at some point thereafter, Haldex obtained verbal opinions, and at least one written opinion, from American counsel regarding the '445 patent. The substance of these opinions, however, is not a part of this record, as Haldex elected not to waive the attorney-client privilege with respect to these particular communications. Dana, on the other hand, did not conduct an independent patent search or investigation or obtain any legal opinions, either oral or written, with respect to validity and infringement issues relating to the Mark II air disk brake and the '445 patent. Instead, in light of an indemnification agreement entered into with its partner in the joint venture,[4] Dana relied on Haldex to handle any and all potential infringement issues concerning the '445 patent.

---

[4] In this regard, it appears from the record that Dana and Haldex are parties to an indemnification agreement whereby Haldex has agreed to indemnify Dana for any legal fees, expenses and/or damages incurred by Dana as a result of the instant litigation.

In November 1999, several months after Haldex had learned of the '445 patent, Dana and Haldex jointly displayed the Mark II air disk brake at an automotive show in Detroit, Michigan, and distributed promotional literature regarding the Mark II device to potential customers in the course of this show.  At around the same time, in late 1999, Haldex began developing another air disk brake product — referred to as the Mark III device — in a good faith, yet ultimately unsuccessful, effort to design an air disk brake that did not infringe the various claims of the '445 patent.[5]  Yet, because Haldex required additional time to manufacture and ship the redesigned product to the United States, actual conversion by Haldex from the Mark II device to the Mark III device was not scheduled to take place until August 2000.  Thus, despite development of an alternative design, Dana and Haldex continued to display and offer the Mark II air disk brake for sale to potential customers in the United States throughout the Spring of 2000, including at an automotive show held in Louisville, Kentucky in March 2000.  In the end, however, not a single Mark II device was ever sold by Dana or Haldex in the United States, either before or after the instant litigation or the Mark III re-design effort.

On May 15, 2000, Knorr, still unaware of the newly-developed Mark III design, filed the instant action against Dana and Haldex alleging that the Mark II air disk brake infringed claims 1-5 and 8-11 of the '445 patent.  Defendants thereafter filed timely answers to the complaint in which

---

[5]     Haldex's design-around effort focused primarily on the "one-piece caliper" and "largely closed rearward area" elements of the '445 patent claims.  Specifically, in designing the Mark III air disk brake, Haldex sought to design an air disk brake that did not include a one-piece caliper that was largely closed in a rearward area.  Yet, Haldex's design-around effort proceeded on two faulty premises: (1) that the "bearing bracket" of the Mark III brake application unit was a second caliper piece, making the Mark III caliper a two-piece rather than a one-piece caliper, and (2) that the opening in the Mark III caliper into which the bearing bracket fits results in the Mark III caliper not being "largely closed" in its rearward area.  It may also be said more succinctly that the design-around effort failed because the Haldex personnel involved were unwilling to forego the essential inventive advantages of the '445 patent.

they denied the allegations of infringement and also counterclaimed for declaratory judgment, claiming that the '445 patent was invalid on grounds of obviousness and indefiniteness.

Following commencement of the  instant litigation, and through at least June 2000, Dana continued to generate test data from the Mark II air disk brakes that had been installed on the eighteen fleet and customer vehicles.  Additionally, in the course of an August 2000 meeting between Dana and Haldex, Dana represented that in the event it were to receive a customer production order for air disk brakes in September 2000, the order would be filled using the Mark II design, not the newly-developed Mark III design.

Defendants eventually injected their design-around effort into the instant litigation in September 2000 by filing a "motion for summary judgment for non-infringement" with respect to the Mark III device, in which they alleged that this alternative air disk brake design did not infringe any claims of the '445 patent.  Defendants simultaneously moved for summary judgment on the issues of infringement and damages as to the Mark II air disk brake.  Knorr, for its part, requested summary judgment as to literal infringement of the '445 patent by the Mark II device, and as to infringement by the Mark III device, as well, both literally and under the doctrine of equivalents.

Sometime in the Fall of 2000, Dana made the decision to cease offering for sale any Mark II air disk brakes in the United States; Dana thus notified its sales and marketing groups not to discuss with customers the specific features of the Mark II device after that time.  Nonetheless, in October 2000, Dana and Haldex again jointly displayed the Mark II air disk brake at another automotive conference, this time the annual American Trucking Association Truck Maintenance Conference held in Columbus, Ohio.  Haldex thereafter terminated all production of the Mark II air disk brake in mid-October 2000.  Later that month, Haldex shipped four of the new Mark III devices

to Dana for a sale price of $350 each.

A *Markman*[6] hearing was held in the instant action on November 28, 2000, resulting in rulings defining various disputed claim terms and phrases used in the '445 patent.[7]  Based in part on these *Markman* rulings, summary judgment was granted in favor of Knorr and against Dana and Haldex on the issue of literal infringement of the '445 patent by the Mark II air disk brake, the first targeted product.  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.,* Civil Action No. 1:00cv803 (E.D. Va. Nov. 28, 2000) (Order).  Significantly, the literal infringement analysis as to this device was limited to a single, relatively minor issue, as defendants conceded that all but one of the elements of the applicable claims of the '445 patent literally read on the Mark II air disk brake.  Thus, defendants' sole argument against a Mark II literal infringement finding was that the "brake application unit" contained in the Mark II device included certain adjustment and de-adjustment shafts that are removable from, and therefore not "preassembled" with, the other components of the Mark II brake application unit, as required by the '445 patent.  This argument was rejected on several alternative grounds and summary judgment was accordingly granted in Knorr's favor on the issue of literal infringement by the Mark II device.  *See id*.  The specific reasons

---

[6]     *Markman v. Westview Instruments*, 517 U.S. 370 (1996).

[7]     Specifically, the six disputed claim terms were construed as follows: (i) "caliper" was defined as "a structure composed of those housing portions that engage about the brake disk and contain a brake application unit;"  (ii) "one-piece caliper" was defined as "a caliper constructed or formed as a single, integral piece;"  (iii)  "largely closed" and "substantially closed" were defined as "for the most part, to a large degree, or in the main closed;"  (iv) "rearward area" was defined as "the area facing away from the brake disk;"  (v) "application unit" was defined as "a mechanical mechanism that multiplies an input force using a lever to provide a greater output force that presses the brake shoes against the brake disk;"  and  (vi) "preassembled" was defined as "assembled beforehand."  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.,* Civil Action No. 1:00cv803 (E.D. Va. Nov. 28, 2000) (Order).

8

underlying the November 28, 2000 *Markman* determinations and summary judgment rulings were later elucidated in a subsequent memorandum opinion. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.*, 133 F. Supp. 2d 833 (E.D. Va. 2001) (*Knorr I*).

Despite the finding of literal infringement, Dana and Haldex nonetheless requested a finding of "no infringement damages" as to the Mark II air disk brake given that Knorr had failed to offer proof that it suffered any monetary damages whatsoever stemming from defendants' use of that product. Indeed, as recognized in *Knorr I*, the record conclusively established that defendants did not sell a single Mark II air disk brake to customers in the United States. *See Knorr I*, 133 F. Supp. 2d at 842. Nor did the defendants intend to sell or offer for sale any Mark II devices in the United States at any future date, as Haldex had since terminated all manufacturing and production of that particular product in lieu of the newly-designed Mark III device. *See id.* The record also established that Haldex did not receive any compensation from Dana for any of the 100 to 200 Mark II air disk brakes that had been shipped to the United States between 1997 and 1999 in furtherance of defendants' joint venture. Instead, it was apparent that the imported Mark II devices were used primarily for display and data collection purposes. *See id.* In the circumstances, Knorr did not oppose defendants' request for a finding of "no infringement damages" with respect to the Mark II air disk brake. Thus, although the Mark II device was found literally to infringe the pertinent claims of the '445 patent, summary judgment was nonetheless granted in favor of Dana and Haldex on the issue of damages attributable to the infringing Mark II air disk brake. *See id.*

Given the finding of literal infringement by the Mark II air disk brake, Knorr's general request for injunctive relief as to that device was granted by Order dated November 28, 2000. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.*, Civil Action No. 1:00cv803

9

(E.D. Va. Nov. 28, 2000) (Order). The parties were thus directed to meet and confer promptly regarding the scope of appropriate injunctive relief and to submit a joint or separate proposed injunctive orders by December 15, 2000. *See id*. The parties thereafter filed separate proposed permanent injunctions and supporting memoranda and the matter was taken under advisement, with the issuance of a final injunction deferred until a later date.

Despite the entry of summary judgment on the issue of literal infringement and the granting of Knorr's general request for injunctive relief, neither Haldex nor Dana ordered the test vehicles that had previously been equipped with Mark II air disk brakes to remain idle. Nor did Dana replace the Mark II air disk brakes installed on these test vehicles with non-infringing brakes, such as prior art air disk brakes or drum brakes. Instead, Dana decided to replace the installed Mark II air disk brakes with Mark III air disk brakes, but only as soon as the new devices were made available to Dana by Haldex. Until that time, Dana opted not to interrupt service of the test vehicles because, according to Dana, this was "the best thing for [its] customers" and anything else would be "very harmful to [its] customers." Thus, as of early January 2001, Dana had removed the Mark II air disk brakes from only five of the eighteen test vehicles. Indeed, as of that date, a number of vehicles equipped with Mark II devices were still being used for commercial purposes in the United States, including transporting commercial goods between Dana's facilities and its customers.

A four-day bench trial was then conducted on the remaining aspects of the case on January 8-11, 2001,[8] in the course of which both Knorr and the defendants presented live and deposition

---

[8]     Specifically, remaining for trial were four issues:  (i) whether the Mark III air disk brake literally infringed the '445 patent, (ii) whether the '445 patent is invalid on grounds of obviousness or indefiniteness, (iii) whether defendants' use of the Mark II air disk brake amounted to willful infringement of the '445 patent, and (iv) whether the case was "exceptional" under 35 U.S.C. § 285, thus entitling the prevailing party to an award of attorney's fees.  It should also be noted that Knorr

testimony and numerous exhibits in support of their respective arguments.[9]  Written Findings of Fact

and Conclusions of Law subsequently issued on February 20, 2001, resulting in a determination of

literal infringement of the '445 patent by the Mark III air disk brake, defendants' re-design effort.

*See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.*, 133 F. Supp. 2d 843

(E.D. Va. 2001) (*Knorr II*).  Defendants' argument that the '445 patent is invalid on grounds of

obviousness and indefiniteness was also rejected in *Knorr II* on various grounds.  *See id.*  And, of

particular significance here, Dana and Haldex were found to have engaged in willful infringement

of the '445 patent through their past and continued use of the Mark II air disk brake.  *See id.*

Additionally, given defendants' willfulness in this regard, the case was deemed "exceptional" under

35 U.S.C. § 285, thus entitling Knorr to an award of attorney's fees insofar as it had incurred fees

and expenses litigating issues pertaining solely to the Mark II device.  *See id.*

The *Knorr II* willful infringement finding was based on a totality of the circumstances test,

---

did not allege willful infringement as to the Mark III air disk brake and it likewise withdrew its
request for damages as to the Mark III device in the course of the bench trial.

[9]      Specifically, Knorr presented the testimony of six witnesses in person: (1) Hans
Baumgartner, an engineer with Knorr and one of the two named inventors of the '445 patent;  (2)
Dr. James Kirk, Knorr's expert on infringement issues;  (3) Wulf Hoeflich, the former head of
Knorr's Intellectual Property Department;  (4) Oskar Flach, a member of Knorr's three-member
Executive Board; (5) Laszlo Straub, Knorr's Vice President of Strategic Planning; and (6) Kenneth
Cage, Knorr's expert on PTO procedures.  Additionally, Knorr offered deposition testimony of seven
individuals: (1) William Hoenes, the Vice President of Dana's Heavy Axle and Brake Division;  (2)
Brad Hicks, a former Engineering Manager and current Global Product Manager for Dana;  (3)
Charles Kleinhagen,  the President of Haldex Corp.; (4) Nils Ake Nelander, Haldex AB's Manager
for Business Development of Disk Brakes; (5) James Clark, Dana's Chief Engineer for Foundation
Brakes and Wheel Equipment; (6) Randy Petresch, Haldex Corp.'s Director of Engineering; and (7)
Matti Pettersson, a former member of Haldex AB's testing department and a current member of its
research and development group.  Defendants, in turn, presented the testimony of four witnesses in
person: (1) Nils Ake Nelander; (2) Charles Kleinhagen; (3) James Clark; and (4) Henry Stoll,
defendants' expert on infringement issues.   Defendants also offered the testimony of Hans
Baumgartner, by deposition, and Donald Dixon Johannesen, a prior art inventor, by affidavit.

requiring analysis of multiple factors,[10] one of which was the fact that Haldex had refused to disclose the nature and contents of the legal opinions that it had obtained from counsel prior to the instant litigation.  Also a factor in the willfulness analysis was the fact that Dana had failed to seek or obtain a separate legal opinion from competent American counsel on the issues of infringement and validity as to the Mark II device.  Under well-settled Federal Circuit precedent in effect at the time *Knorr II* issued, both of these factors raised an adverse inference that any legal opinions that were or would have been obtained by the defendants were unfavorable and thus weighed in favor of a finding of willful infringement.  *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed. Cir. 1994) (recognizing that where, as here, an infringer refuses to produce an exculpatory opinion of counsel in response to a charge of willful infringement, an inference may be drawn that either no opinion was obtained or, if it was, that it was an unfavorable opinion).[11]

Additional factors also weighed in favor of a finding of willful infringement in *Knorr II*.  For example, it was noted that the determination of literal infringement of the '445 patent by the Mark II device on summary judgment did not involve a close legal or factual question, as defendants had

---

[10]    *See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-828 (Fed. Cir. 1992) (listing several factors relevant to the willfulness analysis).

[11]    The adverse inference rule applied in *Knorr II* first arose in *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565 (Fed. Cir. 1986), where an alleged infringer had refused to disclose whether it had sought the advice of counsel on the issue of infringement "when notified of the allowed claims and [the patentee's] warning, or at any time before it began...[the] litigation."  *Id.* at 1580.  In those circumstances, the Federal Circuit observed that the infringer's "silence on the subject, in alleged reliance on the attorney-client privilege, would warrant the conclusion that it either obtained no advice of counsel or did so and was advised that its importation and sale of the accused products would be an infringement of valid U.S. patents."  *Id.*  This so-called adverse inference doctrine was later reaffirmed in *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568 (Fed. Cir. 1988), where the Federal Circuit pronounced the general rule that "a court must be free to infer that either no opinion was obtained or, if an opinion were obtained, it was contrary to the infringer's desire to initiate or continue its use of the patentee's invention."  *Id.* at 1572-73.

raised only one, relatively minor and unpersuasive argument in opposition to Knorr's motion for summary judgment. Moreover, even after Knorr was awarded summary judgment on the issue of literal infringement as to the Mark II device, defendants failed to take prompt remedial action. Indeed, as of January 2001, a number of test vehicles that Dana had previously equipped with Mark II air disk brakes were still being used for commercial and testing purposes. In this regard, Dana had not shown convincingly that it would have suffered any exceptional hardship in immediately replacing the Mark II air disk brakes on these test vehicles with non-infringing brakes following the entry of summary judgment in Knorr's favor. Rather, it was evident from the record that Dana had deliberately yielded to market pressures in deciding to continue using the infringing Mark II air disk brakes on test vehicles pending future receipt of replacement Mark III air disk brakes. Also persuasive in the *Knorr II* willfulness analysis was the fact that Dana and Haldex had continued to use the Mark II air disk brake throughout the Mark III redesign effort, including displaying such devices at various automotive conferences in the United States and distributing Mark II promotional literature to potential customers in the course of these conferences. Finally, given the quantity and quality of the evidence presented by defendants at trial on the issues of obviousness and indefiniteness, it was determined in *Knorr II* that defendants could not reasonably have had a good faith belief throughout the litigation that the '445 patent would ultimately be found invalid. Accordingly, a totality of the circumstances compelled the conclusion in *Knorr II* that defendants' use of the Mark II air disk brake amounted to willful infringement of the '445 patent. *See Knorr II*, 133 F. Supp. 2d at 863.

On March 7, 2001, approximately two weeks after the issuance of *Knorr II*, a Final Judgment and Injunction was entered in this matter enjoining defendants from "infringing the '445

patent by making, using, selling, or offering to sell within the United States,...or by importing into

the United States,...any Mark II air disk brake or Mark III air disk brake, for the remaining life of the

'445 patent." *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.,* Civil

Action No. 1:00cv803 (E.D. Va. Mar. 7, 2001) (Final Judgment and Injunction). Defendants were

also ordered to "cease use of, collect and discard or destroy any infringing Mark II air disk brakes or

Mark III air disk brakes remaining in the United States" within 60 days of the date of the Final

Judgment and Injunction. *Id.* Defendants were further directed, within 30 days of the Final

Judgment and Injunction, to

> collect and destroy all test and demonstration data, including field test
> data, in their possession, developed, acquired or obtained from any
> infringing use of the Mark II air disk brake or Mark III air disk brake
> in the United States by any of the defendants or by any third parties
> supplied with an infringing air disk brake by any of the defendants.

*Id.*

Two weeks later, on March 21, 2001, defendants filed a motion to amend the Final Judgment

and Injunction, pursuant to Rule 59(e) and 60(b), Fed. R. Civ. P., specifically requesting that the

provision requiring them to collect and destroy all test and demonstration data ("test data provision")

be stricken or, in the alternative, amended. Defendants simultaneously moved to stay enforcement

of the test data provision of the Final Judgment and Injunction pending resolution of their motion

to amend. Defendants' motion to stay in this regard was granted by Order dated March 22, 2001,

and their motion to amend was subsequently granted by Order dated April 9, 2001, resulting in the

test data provision being stricken from the Final Judgment and Injunction on the ground that

defendants had established a legitimate, non-infringing use for the disputed test data. *See Knorr-*

*Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.,* Civil Action No. 1:00cv803 (E.D.

Va. Apr. 9, 2001) (Order).

Defendants then promptly appealed the instant matter to the United States Court of Appeals for the Federal Circuit, challenging only the finding of willful infringement as to the Mark II air disk brake, as well as the award of attorney's fees to Knorr under the "exceptional case" standard set forth in 35 U.S.C. § 285. [12] Defendants' primary argument on direct appeal was "that an adverse inference should not have been drawn from the withholding by Haldex of an opinion of counsel concerning patent issues, and from the failure of Dana to obtain its own opinion of counsel," as had been drawn and relied upon in the *Knorr II* willfulness analysis. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., et al.*, 383 F.3d 1337, 1340 (Fed. Cir. 2004) (*Knorr III*). Defendants also argued that the case was not sufficiently "exceptional" under the statute to justify an award of attorney's fees to Knorr in this instance. Knorr, for its part, filed a cross-appeal challenging the April 9, 2001 Order striking the "test data provision" from the Final Judgment and Injunction.

After an initial panel hearing, the Federal Circuit *sua sponte* reviewed the case *en banc* to reassess the so-called "adverse inference" doctrine frequently applied in the context of willful infringement law. In the end, the Federal Circuit agreed with defendants' argument that such an adverse inference is improper, thus overruling nearly twenty years of Federal Circuit precedent to the contrary. Indeed, after noting the significant and chilling effect the doctrine has on the attorney-client privilege, the Federal Circuit held in *Knorr III* that "no adverse inference that an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel." *Knorr III* at 1341. A party may, of course, choose to

---

[12]     Not appealed by defendants were (i) the findings that the Mark II and Mark III air disk brakes literally infringe the '445 patent, (ii) the conclusion that the '445 patent is not invalid on grounds of obviousness or indefiniteness, or (iii) the scope and terms of the injunctive relief.

waive the attorney-client privilege and disclose the advice of counsel.  Yet, as recognized by the Federal Circuit in *Knorr III*, the assertion of the "attorney-client and/or work-product privilege and the withholding of the advice of counsel shall no longer entail an adverse inference as to the nature of the advice."  *Knorr III*, 383 F.3d at 1345.[13]

Accordingly, because such an adverse inference had comprised a portion of the *Knorr II* willfulness analysis — albeit properly so at that time — the finding of willful infringement as to the Mark II air disk brake was vacated by the Federal Circuit and the matter was remanded for a "fresh weighing" of the willfulness and exceptional case issues,[14] "on consideration of the totality of the circumstances but without any evidentiary contribution or presumptive weight of an adverse inference that any opinion of counsel was or would have been unfavorable."  *Knorr III* at 1341, 1346.  The parties have now fully briefed and argued the remanded issues of willful infringement

---

[13]     Judge Newman wrote the majority opinion in *Knorr III*, ultimately concluding, *inter alia*, (i) that an adverse inference with respect to willful infringement may not be drawn when the attorney-client and/or work-product privilege is invoked by a defendant in an infringement suit, (ii) that an adverse inference with respect to willful infringement may not be drawn when a defendant in a patent infringement suit has not obtained legal advice, and (iii) that a substantial defense to infringement is not sufficient to defeat liability for willful infringement even if no legal advice has been secured by a putative infringer.  *See Knorr III*, 383 F.3d at 1344-47.  Judge Dyk, in turn, wrote a separate opinion concurring with the majority opinion in part, but dissenting on the issue of a potential infringer's affirmative duty of due care.  *See id.* at 1348-52.  Specifically, Judge Dyk joined the majority opinion insofar as it eliminated the adverse inference doctrine, but dissented to the extent the majority opinion could be read to reaffirm the affirmative duty of due care, as he "would recognize that the due care requirement is a relic of the past and eliminate it as a factor in the willfulness and enhancement analysis."  *Id.* at 1352.

[14]     Other than a very brief recitation of a few general legal principles applicable to 35 U.S.C. § 285, the Federal Circuit did not reach, discuss or decide any aspect of the "exceptional case" issue in *Knorr III*.  Instead, given its findings on the adverse inference and willful infringement issues, the Federal Circuit merely vacated the initial award of attorney's fees under § 285 and noted that "the award may be reconsidered" on remand "should the judgment of willful infringement be restored."  *Knorr III*, 383 F.3d at 1347.

and attorney's fees under 35 U.S.C. § 285 and the matter is thus ripe for disposition.[15]

## II.

The instant reassessment of willful infringement must be guided by the same principles that governed the initial willfulness analysis minus the adverse inference concerning the defendants' failure to disclose or obtain any legal opinions on infringement and validity issues. Thus, the test for willful infringement is still "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Hall v. Aqua Queen Manufacturing, Inc.*, 93 F.3d 1548, 1555 (Fed. Cir. 1996) (citation omitted). Put differently, "[a] finding of willfulness requires the fact-finder to find that clear and convincing evidence shows 'that the infringer acted in disregard of the patent...[and] had no reasonable basis for believing it had a right to do the acts.'" *American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1530 (Fed. Cir. 1993) (citing *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1565 (Fed. Cir. 1983)).

In all cases, a determination of willfulness is a factual determination to be "made on consideration of the totality of the circumstances." *Knorr III*, 383 F.3d at 1337 (citing *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990)). And, in this regard, although there are no "hard and fast per se rules" with respect to a finding of willful infringement,[16] various factors have been recognized as relevant and thus appropriately considered in the willfulness

---

[15] Also ripe for resolution is defendants' cross-motion for attorney's fees under § 285, filed after the matter had already been appealed and remanded by the Federal Circuit. Specifically, defendants now contend that they, too, are entitled to an award of attorney's fees under the statute insofar as they were required to defend against Knorr's alleged "bad-faith, vexatious litigation on the Mark II brake and 'test data' issue."

[16] *Rolls Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986).

analysis.  Such factors include, but are not limited to, the following:

(i)      whether the infringer deliberately copied the ideas or design of another;

(ii)     whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed;

(iii)    whether the infringer engaged in inappropriate behavior in the course of the litigation;

(iv)     the infringer's size and financial condition;

(v)      the closeness of the infringement and validity issues;

(vi)     the duration of the infringer's misconduct;

(vii)    any remedial action by the infringer;[17]

(viii)   the infringer's motivation for continuing infringing conduct in the face of knowledge of the patent; and

(ix)     whether the infringer attempted to conceal its misconduct.

*See Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-828 (Fed. Cir. 1992).[18]

---

[17]    Indeed, it is clear that district courts must take into account any mitigating or ameliorating circumstances in making its willfulness determination.  *See American Medical*, 6 F.3d at 1531 (stating that "[i]n making a determination of willfulness, the court is also required to consider mitigating or ameliorating factors") (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992)).

[18]    Given the lack of express statutory guidance, the various factors involved in the willfulness inquiry have emerged over the years from Federal Circuit case law.  For example, in *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.3d 1380 (1983), the Federal Circuit held that once a potential infringer discovers the existence of a patent, either through notice from the patentee or otherwise, he has an affirmative duty of due care to avoid infringement of that patent.  *See id.* at 1389-90.  This due care requirement was clarified a few years later in *Bott v. Four Star Corp.*, 807 F.2d 1567 (Fed. Cir. 1986), where the Federal Circuit identified a non-exclusive list of factors to assist the trier of fact in determining whether a putative infringer has engaged in willful infringement.  Such factors include (i) whether the infringer deliberately copied the ideas or design of another, (ii) whether the infringer, when he knew of another's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and

18

In the application of the various factors relevant to the willfulness analysis it is important to have in mind that "[f]undamental to [a] determination of willful infringement is the duty to act in accordance with law." *Knorr III*, 383 F.3d at 1343. Indeed, the Federal Circuit reaffirmed in *Knorr III* that there continues to be "an affirmative duty of care to avoid infringement of the known patent rights of others." *Knorr III*, 383 F.3d at 1345-46 (quoting *L.A. Gear Inc. v. Thom Man Shoe Co.*, 988 F.2d 1117, 1127 (Fed. Cir. 1993)).[19] Thus, the primary focus in a willful infringement inquiry is ultimately on the infringer's intent and reasonable beliefs concerning non-infringement and patent invalidity.[20] *See American Medical*, 6 F.3d at 1531 (stating that a finding of willfulness requires the

---

(iii) the infringer's behavior in the course of the litigation. *See id.* at 1572. The Federal Circuit thereafter added to this non-exhaustive list of relevant factors in *Read Corp v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1987), specifically identifying the nine factors set forth above.

[19]   *See also Commerce Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998) ("As a general matter, a potential infringer with actual notice of another's patent has an affirmative duty of care that usually requires the potential infringer to obtain competent legal advice before engaging in any activity that could infringe another's patent rights."); *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992) (recognizing that "[w]here an infringer has actual notice of a patentee's rights, the infringer has an affirmative duty of due care") (citations omitted). It is on this point that Judge Dyk dissented. *See Knorr III*, 383 F.3d at 1348-52.

[20]   Willfulness is a judicially-created doctrine originally designed to punish blameworthy conduct of actual infringers and deter future infringing conduct by others. Yet, the principles underlying the doctrine of willful infringement have been criticized by many scholars and practitioners in the patent field. *See, e.g.,* Mark A. Lemley & Ragesh K. Tangri, *Ending Patent Law's Willfulness Game*, UC Berkeley Public Law and Legal Theory Research Paper Series, no. 142 (2003). For example, prior to the Federal Circuit's opinion in *Knorr III*, opponents of willful infringement noted the chilling effect that the doctrine had on the attorney-client privilege. *See id.* at. 1 (stating that "[p]atent law turns the attorney-client privilege on its head...[as] [a]n odd set of legal rules stemming from patent law's effort to determine what constitutes willful infringement effectively requires companies confronted with a patent first to obtain a written opinion of counsel and then to disclose that opinion in court"). It has also been recognized that exposure to claims of willful infringement creates a strong disincentive to read a competitor's patents, irrespective of any infringement allegations, which, in turn, undermines the disclosure function that lies at the heart of patent law. *See id.* at p.3 (stating that the rules of willful infringement "discourage engineers and companies from reading a competitor's patents at all, thereby undermining the disclosure function

fact-finder to find that clear and convincing evidence shows 'that the infringer acted in disregard of the patent...[and] had no reasonable basis for believing it had a right to do the acts'") (citations omitted); *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992) (stating that "[w]hether infringement is 'willful' is by definition a question of the infringer's intent" and thus, an infringers "intent and reasonable beliefs are the primary focus of a willful infringement inquiry") (citations omitted).

Even absent the adverse inference now prohibited by the Federal Circuit, a number of factors still support a finding of willful infringement with respect to the Mark II air disk brake.   Indeed, it remains true that the summary judgment determination of literal infringement of the '445 patent by the Mark II device did not involve a close legal or factual question.   Rather, as previously noted, defendants raised a single minor argument in opposition to plaintiff's motion for summary judgment as to the Mark II.   Specifically, defendants argued that the brake application unit in the Mark II air disk brake includes certain adjustment and de-adjustment shafts that are not "preassembled" with the other components of the brake application unit, as required by the relevant claims of the '445 patent.   *See Knorr I*, 133 F. Supp. 2d at 841-42.   Defendants argument in this regard was wholly

---

that is at the foundation of the patent system").

Also worth noting in this regard is that the efficacy of the willfulness doctrine as a deterrent to infringement of valid patents is an empirical question that may or may not be amenable to reliable measurement.   And, given this the question whether to abolish, modify or leave unchanged the current doctrine is arguably better left to legislative resolution than to the intuitions of judges however well-informed.   Also better suited to resolution in the legislative arena are closely-related, more fundamental issues, including whether the high rate of successful patent applications suggests a devaluation of the coin of patentability administratively and judicially, see Quillen, et al., *Continuing Applications and Performance of the U.S. Patent and Trademark Office - Extended*, 12 Fed. Cir. B. J. 35 (2002), and whether weak, arguably invalid patents, once issued, serve to distort markets because they are artificially protected from attack by the high cost of patent infringement litigation.   *See Ellis, Distortion of Patent Economics by Litigation Costs*, 5 CASRIP Symposium Publication Series: Streamlining International Intellectual Property 22 (1999).

unpersuasive and thus plainly rejected in the summary judgment ruling.  *See id.*

Also weighing in favor of a willfulness finding is the fact that defendants failed to take prompt remedial action after Knorr was awarded summary judgment on the issue of literal infringement as to the Mark II device in November 2000.  Rather, the record reflects that a number of test vehicles that Dana had previously equipped with Mark II air disk brakes were still being used for commercial purposes as of January 2001, when the bench trial on the remaining issues commenced.  And, in this regard, Dana did not show convincingly that it would have suffered any exceptional hardship in immediately replacing the Mark II air disk brakes on these test vehicles with non-infringing brakes following the entry of summary judgment in plaintiff's favor.  Instead, it is evident from the record that Dana deliberately yielded to market pressures and customer convenience and satisfaction in deciding to continue using the infringing Mark II air disk brakes on test vehicles pending future receipt of replacement Mark III air disk brakes.

Additionally, given the meager and ultimately unpersuasive evidence presented by defendants at trial on the issues of obviousness and indefiniteness, it cannot fairly be said that defendants, throughout the course of the litigation, had a good faith belief that the '445 patent would be found invalid on these grounds.  And, although Haldex indeed developed the Mark III device in a good faith effort to design around the '445 patent, defendants nonetheless continued to use the Mark II air disk brake throughout the redesign effort, including displaying Mark II air disk brakes at various automotive conferences in the United States and distributing Mark II promotional literature to potential customers at these conferences.  Indeed, defendants' design-around-effort does not negate their continued use of the Mark II air disk brake for testing and display purposes even after the entry of summary judgment in Knorr's favor.  *See American Medical*, 6 F.3d at 1531 (noting that a

21

defendant's "attempt to design a non-infringing alternative does not negate [its] continuing sales of infringing devices during the redesign period").

It is apparent from the record as a whole that defendants did not cease testing, displaying, or offering to sell the Mark II device in the United States when confronted with the instant lawsuit because they wanted to demonstrate that they were actively developing and offering a product in the emerging air disk brake market.  In other words, defendants made a business decision to place the convenience and satisfaction of their customers above their affirmative duty of care to avoid infringing plaintiff's valid patent rights through their use of the Mark II air disk brake.  *See, e.g.*, *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1547-48 (Fed. Cir. 1984) (recognizing that a finding of willful infringement is proper where an accused infringer deliberately yielded to market pressures without adequately investigating the scope of the patent).  And where, as here, a party acts in the best interest of their customers, without any realistic or good faith belief that their product does not infringe the valid patent rights of others, and continues to engage in infringing behavior until a modified product is ready for distribution, a finding of willful infringement is warranted.

In sum, the totality of the circumstances presented here — and wholly without the now-proscribed adverse inference — still compels the conclusion that defendants' use of the Mark II air disk brake, and indeed their continued use of the Mark II air disk brake throughout the instant litigation, amounted to willful infringement of the '445 patent.[21]

---

[21]  While this willfulness finding would normally entitle Knorr to an enhanced damages award under § 284 of the Patent Act, Knorr previously waived its right to seek compensatory or enhanced damages arising out of defendants' use of the Mark II air disk brake by conceding defendant's summary judgment motion for a finding of "no damages" as to that device.

### III.

Given the willful infringement finding, the next question presented is whether the award of attorney's fees to Knorr pursuant to 35 U.S.C. § 285 should likewise remain intact.

A determination as to whether attorney's fees should be awarded to a prevailing party under § 285 is a two-step process. In the first step, the district court must determine whether the prevailing party — in this case Knorr — has established by clear and convincing evidence that the case is indeed "exceptional" within the meaning of the statute.[22] The starting point in the analysis is the language of the governing statute, which expressly grants district courts the discretion to award reasonable attorney's fees to the prevailing party "in exceptional cases." 35 U.S.C. § 285 (providing that "[t]he court in exceptional cases *may* award reasonable attorney fees to the prevailing party") (emphasis added). Although the patent statute itself does not provide any guidance as to the contours of the exceptional case category, it is important to begin the analysis by recognizing that the term "exceptional" is generally defined as "forming an exception," "being out of the ordinary," "uncommon" or "rare." WEBSTER'S THIRD NEW INT'L DICTIONARY 791 (1993).

---

[22] *See, e.g., B. Braun Medical, Inc. v. Abbott Laboratories*, 124 F.3d 1419, 1429 (Fed. Cir. 1997) (recognizing that § 285 "requires the moving party to demonstrate, by clear and convincing evidence, that the case is exceptional; even then, the district court retains discretion as to whether or not to award attorney fees"); *Imagineering, Inc. v. Van Klassens, Inc.*, 53 F.3d 1260, 1267 (Fed. Cir. 1995) (stating that "[t]o prevail, [the asserting party] had to show by clear and convincing evidence that [the opposing party's] conduct was exceptional"); *Carroll Touch, Inc. v. Electro Mechanical Systems, Inc.*, 15 F.3d 1573, 1584 (Fed. Cir. 1993) (finding that "[a]s the party moving for attorney fees, the burden was on [the prevailing party] to prove the exceptional nature of the case by clear and convincing evidence"); *Cambridge Products, Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992) (recognizing that the prevailing party must establish the exceptional nature of a patent infringement action by clear and convincing evidence); *Reactive Metal & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578 (Fed. Cir. 1985) (stating that "[a]t the trial level, a prevailing party who seeks an award of attorney fees has the burden of proof of facts which establish the exceptional character of the case...[and] [t]he quantum of proof required to prove bad faith conduct is clear and convincing evidence").

23

While not explicitly referring to any such plain meaning or dictionary definition, courts have typically found cases to be exceptional where a party has engaged in bad faith litigation or inequitable conduct in the course of the patent proceedings.[23]   Indeed, it is clear that "[d]istrict courts possess inherent power to assess attorney fees as a sanction when a party acts in bad faith, vexatiously, wantonly, or for oppressive reasons." *See, e.g., L.E.A. Dynatech, Inc. v. Allina,* 49 F.3d 1527, 1530 (Fed. Cir. 1995).   Thus, a case is appropriately classified as exceptional under the statute "when the defendant's conduct causes an unnecessary and outcome certain lawsuit or where the defendant displays bad faith in the pre-trial and trial states of the suit."   *Oscar Mayer Foods Corp. v. Conagra, Inc.*, 869 F. Supp. 656 (W.D. Wis. 1994) (citing Kloster, 793 F.2d at 1580).   Bad faith misconduct may also include "bringing vexatious or unjustified suits, attorney or client misconduct during litigation, or unnecessarily prolonging litigation."   *Jurgens*, 80 F.3d at 1570; *see also Epcon*

---

[23]     *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1580 (Fed. Cir. 1996) (identifying bad faith litigation or inequitable conduct as among the circumstances that may render a case exceptional under the statute); *Cambridge Prods. Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050-51 (Fed. Cir. 1992) (recognizing that "'exceptional cases' are normally those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent"); *Advance Transformer Co. v. Levinson*, 837 F.2d 1081, 1085 (Fed. Cir. 1988) (noting that a finding of exceptional circumstances requires proof of actual wrongful intent or gross negligence); *Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565 (Fed. Cir. 1986) (recognizing that "bad-faith displayed in pretrial and trial stages, by counsel or party, may render the case exceptional under § 285"); *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1458 (Fed. Cir. 1984) (recognizing that attorney's fees "are not to be awarded in normal cases involving no unconscionable conduct on the part of the losing party"); *see also Uniflow Mfg. Co. v. King-Seeley Thermos Co.*, 428 F.2d 335, 341 (6th Cir.) (stating that "for an award of attorneys' fees to be upheld the trial court must have found unfairness, bad faith or inequitable or unconscionable conduct on the part of the losing party"), *cert. denied*, 400 U.S. 943 (1970); *Park-In Theatres v. Perkins*, 190 F.2d 137 (9th Cir. 1951) (recognizing in a leading decision issued one year prior to codification of 35 U.S.C. § 285 that "[t]he exercise of discretion in favor of such an allowance [of attorney's fees] should be bottomed upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable considerations of similar force, which makes it grossly unjust that the winner of the particular law suit be left to bear the burden of his own counsel fees which prevailing litigants normally bear").

*Gas Systems, Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002) (stating that "litigation misconduct and unprofessional behavior are relevant to the award of attorney's fees, and may suffice, by themselves, to make a case exceptional").[24]  Litigation of a patent known to be invalid or known not to be infringed may also amount to bad faith under the statute, as may a party's engaging in inequitable conduct during the course of the patent prosecution.[25]  It is equally clear, however, that the mere fact that a putative infringer loses on the issues of validity and infringement at trial, as occurred here, is  insufficient to render a case exceptional under the statute.  *See, e.g., State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226, 1238 (Fed. Cir. 1985) (recognizing that "[m]erely losing on the defenses of invalidity and non-infringement is not enough to make a case exceptional").

In addition to a finding of bad faith or inequitable conduct, a finding of willful or deliberate infringement may, by itself, likewise constitute a sufficient basis for finding a case "exceptional"

---

[24]    *See also* Richard P. Beem, *Recovering Attorney Fees & Damages When Defending Against Bad Faith Patent Litigation*, 80 J. Pat. & Trademark Off. Soc'y 81 (1998) (recognizing that "[a] finding of exceptionality may be bolstered by evidence of misconduct, e.g., an abusive tone exhibited by the party's attorneys,...discovery abuses and advancement of a meritless case,... harassment and misconduct,...or efforts to prolong the litigation and multiply the litigation expense") (citations omitted).

[25]    *See, e.g., Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 811 (Fed. Cir. 1990) (recognizing that where "the patentee is manifestly unreasonable in assessing infringement, while continuing to assert infringement in court, an inference is proper of bad faith, whether grounded in or denominated wrongful intent, recklessness, or gross negligence"); *Hughes v. Novi American, Inc.*, 724 F.2d 122, 125 (Fed. Cir. 1984) (concluding that the record supported the trial court's award of attorney fees to an accused infringer where evidence of sales and advertising which barred the grant of a patent was brought to light seven months prior to trial and the patent owner had no basis thereafter for asserting ignorance of the facts). *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services Ltd.*, 277 F. Supp. 2d 965 (W.D. Wis. 2003) (stating that "[t]he direct and circumstantial evidence regarding plaintiff's failure to disclose material prior art to the patent office makes this an exceptional case").

under the statute.[26]  Nonetheless, and especially significant here, an award of attorney's fees does not

automatically follow from a finding of willful infringement.  *See, e.g., Jurgens v. CBK, Ltd.,* 80 F.3d

1566, 1572 (Fed. Cir. 1996) (recognizing that "a finding of willful infringement does not mandate

that damages be increased or that attorneys fees be awarded") (citations omitted).[27]   Rather,

"willfulness is only one factor, albeit a sufficient one, for the court to examine in determining

whether an award of attorney fees or costs is warranted."  *Century Wrecker Corp. v. E.R. Buske*

*Manufacturing Co., Inc.*, 913 F. Supp. 1256, 1293 (N.D. Iowa 1996) (citing *Revlon, Inc. v. Carson*

*Prods. Co.*, 803 F.2d 676, 679 (Fed. Cir. 1986).  And, in this regard, the question whether a finding

---

[26]   *See, e.g., Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565 (Fed. Cir. 1986) (stating that "[w]illfulness of infringement relates to the accused infringer's conduct in the marketplace...[and] [b]ecause that conduct may be seen as producing an unnecessary and outcome-certain law suit, it may make the case so exceptional as to warrant attorney fees under § 285"); *Milgo Elec. Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 667 (10th Cir.) (recognizing that "[a] finding that infringement was willful and deliberate may justify an award of attorneys' fees to the plaintiff, as well as treble damages, depending on the circumstances"), *cert. denied*, 449 U.S. 1066 (1980); *see also infra* n.28 and accompanying text.

[27]   *See also Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1582 (Fed. Cir. 1992) (holding that the district court did not abuse its discretion in denying a prevailing patentee attorney fees despite a jury finding of willful infringement where "[t]he district court, explaining its denial of fees, remarked on the closeness of the question of willfulness," and declined to find the case exceptional under the statute); *Modine Manufacturing Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) (affirming district court's denial of fees to prevailing patent owner despite a finding of willful infringement where the district court sufficiently "articulated the basis of [its] determination that this case, though 'exceptional' under section 285, does not justify an award of attorney fees" ), *cert. denied*, 500 U.S. 918 (1991);  *Avia Group Int'l, Inc., v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed. Cir. 1988) (stating that "[a]lthough an award of attorney fees, because discretionary, does not automatically follow from the willfulness of an infringement,...the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the prevailing patent owner") (citation omitted);  *Rite-Hite Corp. v. Kelley Co., Inc.*, 819 F.2d 1120, 1126 (Fed. Cir. 1987) (stating that "[a] finding of willfulness does not always lead to the award of...attorney fees");  *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 788 F.2d 1536 (Fed. Cir. 1986) (recognizing that a finding of willful infringement does not assure an award of attorney's fees under the statute, as such an award is an exceptional remedy within the discretion of the district court).

of willful infringement is sufficient to render a case exceptional under the statute necessarily hinges

on a careful examination of the specific facts presented as willfulness itself is always a matter of

degree.  *See Knorr III*, 383 F.3d at 1343 (noting that willfulness is a measure of degree as it

"recognizes that infringement may range from unknowing, or accidental, to deliberate, or reckless,

disregard of a patentee's legal rights") (citing *Rite-Hite Corp. v. Kelley Co.*, 819 F.2d 1120, 1125-26

(Fed. Cir. 1987)).  But importantly, when a finding of willful infringement has been made, the

district court must explain its reasons for not finding the case "exceptional" for purposes of awarding

attorney's fees to the prevailing party.[28]

In the event a case is deemed "exceptional" under the statute, the second step in the § 285

analysis requires the district court then to exercise its discretion in determining whether an award

of attorney's fees is warranted given the particular circumstances of the case.  *See Enzo Biochem,

Inc., v. Calgene, Inc.* 188 F.3d 1362, 1370 (Fed. Cir. 1999).[29]  In other words, even if a case is found

---

[28]    *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed. Cir. 1996) (stating that "[u]pon a finding of willful infringement, a trial court should provide reasons for not increasing a damages award or for not finding a case exceptional for the purpose of awarding attorneys fees") (citing *S.C. Johnson & Son*, 781 F.2d at 201)); *Modine Manufacturing Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990) (recognizing that when a trial court denies an award of attorney's fees to the prevailing party despite a finding of willful infringement, the court must explain why the case is not "exceptional" within the meaning of § 285); *but see Carroll Touch, Inc. V. Electro Mechanical Sys., Inc.,* 15 F.3d 1573, 1584 (Fed. Cir. 1993) (concluding that express findings not necessary if record provides sufficient basis for reviewing trial court's exercise of discretion).

[29]    *See also Graco, Inc. v. Binks Manufacturing Co.*, 60 F.3d 785, 794-95 (Fed. Cir. 1995) (stating that "[a] finding by a court that a case is exceptional is a factual determination...whereas the decision to award fees is discretionary"); *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 18 F.3d 927, 933 (Fed. Cir. 1994) (recognizing that "[w]hen considering a request for an award of attorney fees under 35 U.S.C. § 285, the trial judge undertakes a two-step inquiry: he or she must determine whether there is clear and convincing evidence that the case is 'exceptional,' and if so, whether an award of attorney fees to the prevailing party is warranted...The first step concerns a question of fact which we review for clear error,...and the second lies within the discretion of the trial judge, which we review for abuse...").

27

to be "exceptional" within the meaning of § 285, it does not necessarily follow that attorney's fees must be awarded to the prevailing party.  Rather, a number of factors are relevant in determining whether an award of attorney's fees is appropriate in a given case, including the "closeness of the case, tactics of counsel, the conduct of the parties and any other factors that may contribute to a fairer allocation of the burdens of litigation as between winner and loser." *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1051 (Fed. Cir. 1987).[30]  Courts may also consider the litigation conduct of both sides in connection with evaluating and awarded attorney's fees under the statute.  *See Motorola, Inc. v. Interdigital Technology Corp.*, 121 F.3d 1461,1468 (Fed. Cir. 1997) (stating that "[e]ven if the district court had found the case exceptional, it would have enjoyed considerable leeway to deny fees...in light of [the prevailing party's] litigation misconduct"). And, in all cases, a district court's "choice of discretionary ruling should be in furtherance of the policies of the laws that are being enforced, as informed by the court's familiarity with the matter in litigation and the interest of justice."  *Id.* (citing *Yarway Corp. v. Eur-Control USA, Inc.,* 775 F.2d 268, 277 (Fed. Cir.1985)).  Thus, "[a]ttorney fees are not to be routinely assessed against a losing party in litigation in order to avoid penalizing a party 'for merely defending or prosecuting a lawsuit,'... and are awarded to avoid a gross injustice."  *Revlon, Inc. v. Carson Products Co.*, 803 F.2d 676, 679 (Fed. Cir.), *cert. denied*, 479 U.S. 1018 (1986).

In sum, Congress in choosing to limit district court authority to award attorney's fees to

---

[30]  *See also Delta-X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 414 (Fed. Cir. 1993) (recognizing that "[t]he trial judge, after presiding over the preparation and trial of the case, can best weigh the relevant considerations, such as the closeness of the case, the tactics of counsel, the flagrant or good faith character of the parties' conduct, and any other factors contributing to imposition of...fair allocation of the burdens of litigation"); *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986) (same).

"exceptional" cases has made clear that this should occur only in rare or extraordinary cases. And courts elucidating this statutory language have generally found that "exceptional" cases are those rare or extraordinary cases blighted and marked by a party's bad faith or inequitable conduct.[31] These principles, applied here, compel the conclusion that this case is not exceptional within the meaning of § 285.

As an initial matter, Knorr has failed to establish by clear and convincing evidence that defendants engaged in any bath faith litigation or inequitable conduct in the course of the proceedings. *See Mahurkar*, 79 F.3d at 1580 (identifying bad faith litigation or inequitable conduct as among the circumstances that may render a case exceptional under the statute). Counsel for both sides litigated their clients' respective positions vigorously and aggressively, as must be reasonably expected where, as here, there are experienced and zealous legal advocates involved. It is true that numerous claims, motions and objections were advanced by the parties in the course of the instant litigation, some substantially less meritorious than others; but a fair assessment is that reasonable, non-frivolous arguments predominated. To be sure, the combative lawyering on display in this case sometimes served to generate far more heat between the parties than to cast light on the issues. Yet, it cannot be said that the parties or their counsel acted in bad faith in any respect in their conduct of the litigation.[32]

---

[31]   *See supra*, nn. 23-25 and accompanying text.

[32]   *See, e.g., Mosinee Paper Corp. v. James River Corp. of Virginia,* 22 U.S.P.Q.2d 1657, 1664 (E.D. Wis. 1992) (recognizing that it is expected that patent litigation will be hard-fought and not necessarily according to the "Marquis of Queensberry rules"); *Morgan Adhesives Co. v. Chemtrol Adhesives, Inc.,* 574 F. Supp. 832, 836 (N.D. Ohio 1983) (recognizing that in the absence of bad faith, courts are unwilling to discourage attorneys from "that vigorous representation of clients their Code of Professional Responsibility demands of them"), *aff'd,* 765 F.2d 158 (Fed. Cir. 1985).

Moreover, although defendants may indeed have engaged in willful infringement with respect to the Mark II air disk brake, defendant's specific conduct underlying the willfulness finding is not so egregious or in contempt of their legal obligations under the patent laws as to justify an award of attorney's fees. In this regard, it is undisputed that there were no sales of any Mark II air disk brakes to customers in the United States, either before or after the instant litigation was initiated. The record is also devoid of any evidence that Knorr lost a single sale, order, customer or license as a result of defendant's willful infringement of the '445 patent; indeed, Knorr ultimately claimed no infringement damages. Thus, although a finding of willful infringement, in appropriate circumstances, entitles the prevailing party to an enhanced damages award under § 284,[33] Knorr actually stipulated to a summary judgment finding of "no damages" with respect to defendants' use of the Mark II air disk brake, thereby waiving its right to seek any damages or enhanced damages under the applicable statute. *See, e.g., Polysius Corp. v. Fuller Co.*, 709 F. Supp. 560, 577-78 (E.D. Pa. 1989) (declining to find the case exceptional under § 285 despite a finding of willful infringement where, *inter alia*, defendant made no infringing sales and plaintiff sought no money

---

But this is not to say, of course, that the parties' judgment and decisions concerning tactics, arguments, etc. were flawless.

[33] That particular statute directs district courts to award damages to an injured patentee "adequate to compensate for the infringement" and grants district courts the discretion to "increase the damages up to three times the amount found or assessed" against a culpable infringer. *Id.* 35 U.S.C. § 284. Although the statute does not provide express guidance in this regard, the Federal Circuit has made clear that such an enhanced damages award involves a two-step inquiry, namely (i) whether the facts establish that the infringer is guilty of conduct upon which increased damages may be based and, if so, (ii) whether and to what extent the damages award should be increased given the totality of the circumstances. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996). As relevant here, it is clear that "[a]n act of willful infringement satisfies this culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award." *See id.* (citations omitted).

damages from defendant).

The conclusion that defendants did not act in bad faith finds further support in their albeit unsuccessful attempt to design around the '445 patent with the Mark III air disk brake, which, unlike the Mark II summary judgment analysis, presented a very close case at trial on the issue of literal infringement.  Nor does the record reflect any deliberate copying or attempt to conceal infringing behavior on the part of the defendants in this instance.  It is also noteworthy that although defendants did not act as promptly as they might have after the entry of summary judgment in plaintiff's favor, they nonetheless ultimately complied in good faith with the time line for dismantling and destroying all Mark II and Mark III air disk brakes as set forth in the Final Judgment and Injunction issued in this case in March and April of 2001.

Put simply, it is apparent from the record that with respect to only 18 vehicles, defendants, essentially yielding to market pressures and customer satisfaction, did not cease their infringing activities as soon as they should have.  In doing so, however, defendants did not engage in any actions in an intentional effort to harm Knorr in any way or cause Knorr to lose profits, as confirmed by Knorr's decision not to pursue an award of damages in this case.  Instead, defendants' willful infringement of the '445 patent resulted primarily from their failure to remove the infringing Mark II air disk brakes promptly from Dana's 18 fleet and customer test vehicles and to cease displaying the Mark II air disk brake at promotional shows following the entry of summary judgment in Knorr's favor.  And, while these actions are indeed sufficient to give rise to a finding of willful and intentional infringement with respect to the Mark II device, they are insufficient to render this case

"exceptional" under § 285.[34]

Accordingly, in the circumstances, Knorr's motion for attorney's fees under § 285 is properly denied.[35] An appropriate order will issue.


/s/
_____

Alexandria, VA                              T. S. Ellis, III
June 6, 2005                                 United States District Judge

---

[34] Nor is this conclusion inconsistent with the result reached in *Knorr II*. While the result here may appear to be inconsistent given that the *Knorr II* finding of willful infringement has been confirmed on remand, while the *Knorr II* finding of an exceptional case has not, the absence of the now-proscribed inference is the reconciling difference. The original exceptional case finding, although not expressly stated in *Knorr II*, rested significantly on the then-permissible inference that the defendants engaged in infringing actions despite the presumed advice of competent patent counsel that the '445 patent was valid and infringed by the Mark II device. Indeed, the fact that a putative infringer would choose to ignore the unfavorable advice of counsel is clearly and closely akin to the type of bad faith conduct typically found exceptional under § 285. Yet, given that the adverse inference that weighed so heavily in the *Knorr II* "exceptional" case analysis is now impermissible, the record as a whole no longer supports the conclusion reached in *Knorr II*.

[35] Even assuming Knorr had established by clear and convincing evidence that this is an "exceptional" case under § 285, an award of fees would remain discretionary with the district court and would be appropriate only if necessary to prevent "a gross injustice" between the parties in the case. *Revlon*, 803 F.2d at 679. Because this is not an exceptional case, this further discretionary issue is neither reached nor decided. Additionally, assuming without deciding that defendants' cross-motion for attorney's fees under § 285 is timely despite the fact that it was filed after the instant case had been appealed and remanded by the Federal Circuit, defendants, too, have failed to establish by clear and convincing evidence that the case is exceptional within the meaning of the statute or that even if exceptional from their perspective, that an award of fees is warranted.